## HAUSAM v. PARKER.

No. 2567.  Opinion Filed November 14, 1911.

Rehearing Denied February 27, 1912.

(121 Pac. 1063.)

1.   **ELECTIONS—Canvass of Vote—Evidence—Duplicate Certificate.**
The duplicate certificate signed by the counters of a precinct, pro-
vided for by section 3136, Comp. Laws 1909 (Sess. Laws 1907-08,
c. 31, art. 2, sec. 8), the other two duplicates of such certificate,
including that in the back of the book of ballots, having been
lost, as a rule, is competent evidence of the result of the election
in such precinct.  See **State ex rel. Montgomery v. State Election
Board**, 29 Okla. 31, 116 Pac. 168.

2.   **APPEAL AND ERROR—Findings by Court—Conclusiveness.** The
rule is well settled that where a case is tried by a lower court
without a jury, and special findings of fact are made, based partly
upon oral testimony, such findings as a rule are conclusive upon
any disputed and doubtful question of fact.

3.   **SAME—Review—Disqualification of Judge—Objection Not Made
Below.**  No application having been filed with the clerk of the
lower court setting forth the grounds upon which it is claimed the
trial judge was disqualified, nor any request presented to said
judge for him to certify to such disqualification, and no showing
being made as to why such application or request was not made
in due time prior to the beginning of the trial, the losing party
will not be permitted for the first time in this court to success-
fully contend that the trial judge was prejudiced, and for that
reason a finding of fact was made against him which would not
have been made had not such prejudice existed.

(Syllabus by the Court.)

*Error from District Court, Wagoner County;*
*R. C. Allen, Judge.*

Action by J. H. Parker against A. L. Hausam.  Judgment for
plaintiff, and defendant brings error.  Affirmed.

*Sutherlin & Thigpen* and *Hunt & Hunt* (*Bailey & Wyand,*
on the brief), for plaintiff in error.

*A. A. Davidson* (*Robert F. Blair,* on the brief), for defendant
in error.

WILLIAMS, J.  This proceeding in error is to review a judgment in an action in the district court of Wagoner county wherein J. H. Parker, the defendant in error, as plaintiff, contested the right of A. L. Hausam, the plaintiff in error, as defendant, to the office of commissioner of district No. 1 of said county.  The contest grew out of the election held on the 8th day of November, A. D. 1910, and involved precincts Nos. 3, 4, and 6.  The findings and judgment of the trial court' are in part as follows:

"* * * That the names of the said plaintiff and defendant were upon the tickets of their respective parties voted in all precincts within the said First commissioner's district at the general election held November 8, 1910.  It appears, and I so find from the testimony of G. D. Carl, who was on the 8th day of November, 1910, and now is, secretary of the county election board of Wagoner county, and the custodian of the records of said board, and all of the ballot boxes returned from the several precincts in the First commissioner's district, that the First commissioner's district of Wagoner county is divided into eight voting precincts, numbered 3, 4, 5, 6, 7, 8, 9, 16; that there was canvassed by the county election board, composed of Hon. J. M. Reed, chairman, Dr. G. D. Carl, secretary, and Hon. C. J. Brown, the following precincts in the First commissioner's district, to wit:  Precincts numbered 3, 5, 7, 8, 9, 16.  That the abstract and certificate of votes received by the several candidates for county, district, and township officers show that in the precincts above named the plaintiff and defendant received the following votes for the office of county commissioner, A. L. Hausam, 260; J. H. Parker, 263.  That the said election board did not canvass the returns from precincts 4 and 6.  Upon the trial of this cause it was shown that in the ballot box from precinct No. 6 there were found four papers entitled certificates.  The plaintiff contends that three of these purported certificates show upon their face that they are in fact papers used by the counters for the purpose of tallying the votes.  From a careful review and inspection of these papers, and the testimony of the witnesses in relation to same, it is apparent that three of the purported certificates were used for the purpose of tallying the vote, and that only one was intended as a certificate of the returns from said precinct, but inasmuch as the four have been signed, some by all, and some by a part of the counters of that precinct, and that the paper which plaintiff claims is the official certificate from said precinct was signed by only two of

the four counters, I do not think it is entitled to admission, and its rejection by the county election board was proper. It appears from the testimony of the witnesses introduced in this case, and the court finds, that precinct No. 4 was not canvassed by the county election board for the reason that no certificate of returns was in the box.

"The inspector from this precinct, Luther McCormick, was produced as a witness on behalf of plaintiff, and in his explanation as to the failure of the officers of the election in precinct 4 to inclose the certificate in the ballot box from said precinct, and as to the correctness of the certificate which he produced on the witness stand, made the following statement: 'A. When we held our election November 8th, after we got done counting I held a certificate like that. I fetched the box over here on November 9th. Left Wagoner on the M. O. & G. about 4:30 for Muskogee. After I left here, they opened my box, and found that my counters' returns were not in there, and I had the certificate in my pocket that day that I was to keep, and I had showed it here to the election board and others and kept that. They knew that I had it. They caught me at Wagoner and told me that my returns were not in the box, and that I had a certificate and that they wanted it, so they could count the box. I says, "All right, they are sure in there." I says: "I think you will find them in there somewheres. We might have got them in the wrong envelope, but I am certain they are in there. But," I says, "you can have this one." So I goes home at 11:15 Wednesday night. On Thursday noon I was informed that there was some stuff left there at our voting precinct that ought to have been left in that box. I went, and when I found it, it was the envelope that contained this certificate, the envelope, ballots of the county, and the two tally sheets, and the envelope was unsealed, and so I didn't know what to do with them, and I telephones to the Democratic chairman of the county, and asked him what to do with it, and what I had done, and he said everything was all right, and so I asked him if I must express that to him, and he says yes, just express it over to him, and I went and looked at it again and seen what was in it, and I seen that this certificate was in there, and it struck me that I ought to have a certificate, and I took that certificate out of that envelope, and put it in my pocket, and I have had it ever since, and the other stuff I expressed to Hess Watts.' Mr. McCormick was corroborated by W. E. Tow and J. L. Davis, both official counters in precinct No. 4, both of whom testified that the said certificate is in the same condition as it was when

prepared by them, and that it is a true certificate of the vote in said precinct.

"From said evidence, I am of the opinion, and so find, that said certificate is genuine, has not been altered or changed in any particular, and is in the exact condition as when prepared by the officers in precinct No. 4; that it gives a true account of the vote received in said precinct by the plaintiff and defendant herein; that it has been in the possession and under the control of the official inspector from said precinct since it was found on the morning after the election; that it was lost, and therefore in the possession of no one before that time; that the statement made by the several witnesses produced from said precinct that said certificate is now in the exact condition as it was when signed by the officers, and that the record of the vote contained therein for the officer of commissioner from commissioner's district No. 1 is true and correct; and that said certificate shows that in said precinct there was cast for the plaintiff·herein 71 votes, and for the defendant herein 55 votes.

"In support of his allegation of fraud in the conduction of the election held on the 8th day of November, 1910, in precinct No. 3, many witnesses were produced, sworn, and examined. I will review the testimony of· said witnesses only in so far as I deem necessary in arriving at the conclusions reached by me in this opinion.

"The first witness produced on the part of the defendant upon said allegation was Lester Sappington. When first sworn, this witness seemed exceedingly anxious to relate his story, and to finish his narrative as quickly as possible. When he lifted his hand·to be sworn, it required some effort on the part of the court and bailiff to prevent his telling the whole story. After succeeding in quieting him, he finally gave the court information that he saw Kelly Gibson give a white man a dollar on election day, and tell him to go and get his dinner and vote for Parker, and also gave a negro a dollar, and told him to go and get his dinner and vote for Parker. This witness, though he has lived in the community quite a while, did not know who the parties were to whom the money was given, could not describe them except by color, and had not seen them since that he knew of. and his very demeanor upon the stand drives me to the inevitable conclusion that he is unworthy of belief, which, though probably excusable by reason of the fact that he is of tender years, does not entitle his evidence to credit, and if credited proves no issue in this case.

"Kelly Gibson denied positively the facts stated by young Sappington. A. C. Wilson, a witness in this case produced by the

plaintiff, testified that on election day, and near the voting precinct No. 3, he approached Kelly Gibson, and requested him to lend him 25 cents in order that he might buy some sandwiches being sold by the ladies of that community near the place of voting; that Kelly Gibson did not have the change, and handed him $1; that the witness purchased three sandwiches for 30 cents, and immediately after dinner returned 50 cents of the $1, and later returned the balance of the money; that nothing was said to him by Kelly Gibson as to how he was expected to vote; and that Kelly Gibson did not give him the money for the purpose of influencing, and did not try to influence him, but, upon the contrary, loaned him the money upon request.

"Philip Rough, a witness called on behalf of the defendant, stated that he is a member of the negro race; that before the election Kelly Gibson was passing the field where the witness was working, and asked him if he was going to vote. Upon being told that he did not know whether he was or not, Kelly Gibson asked him for whom he intended to vote, and upon telling him that he intended to vote for Parker, was requested to come out and vote and bring his neighbors. This witness did not say to which election he referred, and Kelly Gibson stated that he did have a conversation with the witness when he was working in the field during the summer and before the primary election; that he asked him to come out and vote for Parker; that he did not see the witness at any time, or have any conversation with him after the primary election. And I so find from the evidence in this case.

"John S. Bilby was produced by the defendant, and he testified that before the election held on the 8th day of November he had several spirited conversations with Gibson, and in one he stated to Gibson that he had rather intended to vote for Mr. Parker, but that the thing had got too hot now, and he could not do it; that during the course of the conversation Kelly Gibson predicated the statement with an oath that he would beat Hausam at any cost. I cannot see that this evidence, weighed in the light of all the other evidence and circumstances in this case, if true, proves or tends to prove a conspiracy between the officers of the election to defeat Mr. Hausam. Mr. Bilby further stated that after retiring to his booth, when he went to cast his ballot on election day, he did not find any ticket and walked back, and the officers gave him a ticket; that he was figuring on marking his ticket, and asked Ed Conklin how to mark it; that when he went back to the booth Ed Conklin went after him, and put his finger

on one of the names and remarked that he was a good fellow. Mr. Bilby stated that Mr. Conklin did not refer to either of the parties of this action, and a motion to strike the evidence was confessed.

"Fayette Wertz, a witness called on behalf of the defendant, stated that in Coweta before the election Kelly Gibson asked him how he was going to vote; that witness replied that he was going to vote for Mr. Hausam; that thereupon Kelly Gibson proceeded to try to influence this witness against Mr. Hausam, and persuade him to vote for Mr. Parker. That his argument was not convincing is demonstrated by the fact that the witness testified that he voted for Mr. Hausam. The other evidence of this witness is in my opinion immaterial to the issues in this case.

"Jake H. Dryden, a witness called on behalf of the defendant, stated that before the general election on the streets of Coweta, he heard Ed Conklin make the statement that he would let every negro vote in Adams Creek township to defeat Hausam. Mr. Dryden states that he was a warm supporter of Mr. Hausam; that he could not tell the exact language that Mr. Conklin used; that upon hearing said statement he stopped, but heard nothing more.

"Mr. A. B. Downs stated that when he was preparing his ballot Mr. Conklin put his finger on Mr. Parker's name, and asked him to vote for Parker, and he told him that he could not do it, and that he did not do it, and stated that Conklin did not do anything more. The witness stated that he did not think he had marked any of the ticket at that time, and that he did not know that Mr. Conklin saw him mark any of his ticket. That is the only witness who stated that he was in any way approached by Mr. Conklin that day, or that Mr. Conklin did anything on that occasion further than was required by law. From the appearance of the witnesses who testified, the overwhelming impeachment of this witness by the testimony of Mr. Conklin, and all the other officers at that precinct, I am forced to the conclusion that no attempt was made by Mr. Conklin to influence this voter; especially in view of the fact that the witness states that Mr. Conklin did not argue the question with him, and that the witness did vote for the defendant.

"A number of the witnesses were introduced by the defendant in an effort to show that the booths in this precinct were so arranged that the officers of the election could see the voter preparing his ballot. I find the fact to be that Dr. Carl, as secretary of the county election board, and in the performance of his duties

as such, shipped to Ed Conklin, the inspector, two or three booths at Catoosa; that these booths were not received by Mr. Conklin; that he, in conjunction with the other election officials in that precinct, prepared booths; that they were prepared and put up as required by law. Mr. Conklin and all the other election officers in that precinct stated that they did not see a single voter stamp his ballot on that day, and could not see them, and made no effort to see how any voter voted. And I so find the facts to be that none of the officers, or any one else, saw any voter stamp his ticket.

"A number of witnesses were introduced to show that Kelly Gibson went into the voting place a number of times during the day while the election was being held. The evidence uncontradicted in this case shows that Kelly Gibson was a deputy constable, appointed especially for the day; that he was appointed at the instance of the Democrats of the county for the purpose of preserving order at the polls. All of the election officers testify that they did not see him in the house that day, except possibly one or two who stated that he did come in one time, and asked for and received a drink of water, and immediately went out again. It occurs to me, and I find the fact to be, that some of the officers conducting the election at that precinct would have known it if Kelly Gibson frequented the house, and their testimony being frank and positive that he did not go inside the house except on the occasion referred to, and was not in consultation with any of the officers during the day regarding the election, and that he did not electioneer within the prohibitive territory of the voting place. I find the fact to be that on the 8th day of November, 1910, the election held in precinct No. 3 was as orderly as it was possible to hold an election in any precinct, and in fact there was no disorder at all at said precinct; that the officers performed their duties under the law; that they were guilty of no misconduct on said day; that all of the requirements of the law as to the manner of conducting elections were fully and faithfully complied with by these officers; and that from this record. —that is, the evidence of the witnesses produced in this case— the charge of conspiracy, irregularity, or misconduct in the holding of said election by any of the officers of said election, or any other person, is unwarranted and unfounded.

"Having disposed of this feature of the case, I now pass to the question of whether or not the ballots will be admitted in evidence for the purpose of contradicting or impeaching the certificate of returns made, certified, and sworn to in the manner

and form provided by law by the officers of precinct No. 3. In support of his allegation contained in his amendment to his amended answer that there were mutilated ballots in the box from precinct 3, which were counted in favor of the plaintiff, the defendant was permitted to introduce the ballots. Preliminary to the introduction of the ballots, several witnesses were examined as to the condition of the box and ballots. The first witness, Dr. Carl, secretary of the election board, stated that after the completion of the canvass by the county election board all the boxes, including the box from precinct 3, were sealed with a paper seal, and the names of the members of the county election board were written across the seal. It appears from the evidence, and I so find that this box has been in a room provided by the board of county commissioners for the county election board; that part of the time since the box has been in the room it has been used as a storage room for 'booze'; that Dr. Carl, the janitor, Mr. Brown, and the witnesses do not know who else have had keys to the room; that there were no safeguards at all thrown around this room; that it could be easily entered; that the ballot box from precinct 3 was sealed with a paper seal used by druggists for the purpose of labeling bottles; that by placing the box near the stove or heat the seal would drop off, and I do find that it has been removed since the box was canvassed by the county election board; that the keys to this box were all retained by Dr. Carl, who testifies that they were kept by him in his desk; that the desk was open during the day, and locked during the night; that sometimes there were in the office Dr. Bates and Dr. Carl, and part of the time during the day there was neither in the office —so it would have been easy for any one to have removed the keys from Dr. Carl's possession without detection by Dr. Carl. From his appearance upon the stand, his frankness in his answers made to the questions propounded to him, his demeanor and appearance upon the stand, I am convinced that those keys were not used by Dr. Carl, or by others by his permission for the purpose of entering the ballot box for any unlawful purpose. From the facts and circumstances in this case, however, I am forced to the conclusion that they have been removed from his possession by some one else, and the box entered.

"Upon opening this box, this package which all of the election officers from precinct No. 3 testified was sealed and in good condition when it was placed in the box, and which fact no living witness has disputed, was torn almost entirely in two. It bore evidence of having been torn by the hand of some one, the tear

beginning a third of the way down from the top, and was torn nearly in two, leaving the two parts hanging; that the opening made by the tear was of sufficient size to permit the removal from the package of the ballots contained therein. Several witnesses testified that there were a number of envelopes that were ripped and torn in any number of the boxes from the several precincts in the First commissioner's district. Mr. C. J. Brown, of the election board, swore that none of them were torn in the manner in which this was torn; that it could not be so torn by the weight of the ballots; that those that did have openings were split along the folds. Not a single witness has disputed this testimony, and I am therefore bound to find it to be true.

"Upon removing the ballots in the presence of the court, a number of witnesses were sworn. Delbert Buckler, a witness called on behalf of the plaintiff, testified that he was one of the official counters at the election held in precinct No. 3, Wagoner county, at the election held on the 8th day of last November. This witness testified that the voted county ballots from precinct No. 3 were sealed on the top by Charley Hoskins in the presence of the witness; that the impression of the township seal was made upon the sealing wax placed on the ballots. When these ballots, bearing a seal, were presented to Mr. Buckler, he stated that the seal did not seem to be as plain as when placed upon the wax. When asked if it looked like the one that was put on by the board, he answered: 'No, sir; there is no distinction there of any stamp much at all.' After closely examining this seal, I must find that it does not bear the impression of any stamp, and was not in the condition when presented to the court that it was in when it left the precinct election board of precinct 3. That it has been tampered with to my mind is evident from the testimony of witnesses, and the appearance of the seal. Opening these ballots, the count was proceeded with. Up to the count of about two-thirds of the ballots, or more, there was no appearance that they had been tampered with. Then almost consecutively were found eighteen mutilated ballots, mutilated not only as to the office of the county commissioner, about all of which were stamped in front of the names of Mr. Parker, and other names, and in front of the name of Mr. Hausam. Then were found ten ballots that were stamped in the circle under the eagle, the emblem of the Republican party, and in the square opposite Mr. Hausam's name. Mr. Buckler stated that as one of the counters he called off all the county ballots voted in precinct No. 3; that he personally inspected and examined every ballot; and that Mr. Sallee, another counter,

stood beside him and inspected and examined every ballot. Mr. Buckler was handed the eighteen mutilated ballots which by the recount by the court showed were mutilated, and he stated positively that none of these ballots were marked and stamped at the time he called them off, and they were strung and sealed as they are now.

"Mr. Buckler stated that he is a Democrat in politics, and votes the Democratic ticket. On cross-examination he was asked if it might not be possible that he is mistaken, to which question he answered emphatically, no, that he was not mistaken, but upon the contrary knows positively that those ballots have been mutilated since they were called off by him, strung, sealed, and placed in an envelope and sealed. Upon this question Mr. Sallee also stated positively that said ballots were not in the condition as when they were counted by the precinct election board; that he is politically a Socialist, and did not vote for either of the parties; that he stood by and watched the count of every ballot, and knows positively that they have been mutilated since they were strung, sealed, inclosed in the envelope, and placed in the ballot box. Both of these witnesses swore positively that they counted every ballot for Mr. Parker that he received; that they counted every vote for Mr. Hausam that he received; and that the certificate of returns from said precinct showing 114 votes for Mr. Parker, and 40 votes for Mr. Hausam, is true and correct. Mr. Buckler, as stated, is a Democrat, a man of more than ordinary intelligence, whose appearance upon the witness stand impressed me with his honesty, his disinterestedness in the result of this action, and with the fact that he was telling the truth about the matter about which he was testifying. Mr. Sallee also showed that he was disinterested, and I believe not only intended to, but did, tell the truth about the matter about which he was testifying.

"C. N. Hoskins, a witness called on behalf of the plaintiff, stated that he was a legal voter on the 8th day of November, 1910, in precinct No. 3; that politically he is a Democrat, and votes the Democratic ticket; that on the said day he was one of the official counters in said precinct; that he counted the votes as they were called off by Mr. Buckler; that he did not count any votes in favor of Mr. Parker or Mr. Hausam, or against either of them, except such as were called for them by Mr. Buckler; that his tally of the votes corresponded with the tally of the other counter, S. W. Orcutt; that his tally showed 114 votes for Mr. Parker, 40 votes for Mr. Hausam; that said ballots were strung by Mr. Sallee, and were sealed, placed in an envelope, the envelope

sealed, the officers' names written across the seal, and placed in the ballot box.

"S. W. Orcutt, a witness called on behalf of plaintiff, states that on the 8th day of November, 1910, he was a legal voter in precinct No. 3; that he is a Republican in politics, and votes the Republican ticket; that he was one of the official counters in said precinct on said day; that he, with Mr. Hoskins, tallied the votes as they were called by Mr. Buckler; that the tally kept by Mr. Hoskins, as to the candidates for commissioner, Mr. Hausam and Mr. Parker, agreed exactly.

"Both of these witnesses present a good appearance upon the witness stand, and impressed me with the fact that they were telling the truth. All of these witnesses testified positively as to the condition of these ballots as to being mutilated, sealed, and inclosed, and not a single witness even intimated the contrary, and so far as the evidence is concerned tending to show the mutilation of these ballots since they were placed in the ballot box is uncontradicted, the witnesses unimpeached, so I must find the fact overwhelmingly proven that these ballots have been tampered with, and mutilated since they were counted, sealed, and placed in the ballot box.

"I have carefully examined the ballots from this box, and in fact the entire contents of the box. Several witnesses testified that there were from two to four mutilated ballots which were placed in the box. That they were sealed in an envelope to themselves by the official counters of said precinct. The box when opened in court did not contain this package, but did contain all of the ballots detached from the book of ballots, which is another fact and circumstance which convinces me that the box has been tampered with, the mutilated ballots removed from their place, mixed, and mingled with the counted ballots. The ballots themselves which have been testified to by the officers of said precinct show clearly upon their face that many of them had been stamped in the square opposite the name of A. L. Hausam with a stamp that differs in appearance, both as to the shape and width, from any of the stamps used in stamping all of the other ballots contained in the box; that many of the stamps of the tickets showing that they have been stamped in the circle under the emblem of the Republican party, and also in the square opposite the name of A. L. Hausam differ in shape and width from any other stamp used by the voters in said precinct, except those which were used by whoever tampered with the box in mutilating the eighteen ballots testified to by the witnesses, and the ten Re-

publican ballots for Mr. Hausam. This piece of forgery is so flagrant and so clear that I do not believe any man of even ordinary intelligence would hesitate for a single moment in stating that the stamp used in effecting the mutilation, and in increasing the vote of Mr. Hausam by stamping in front of his name upon the straight Republican tickets, is entirely different from that used in voting all the other ballots, and was not made by any stamp used by the voters on election day in indicating their choice upon the ballot counted and canvassed by the precinct officers.

"The precinct certificate from said precinct shows clearly upon its face as to the office of county commissioner that it has not been tampered with, or changed in any particular since it was made out. The figures remain the same as when written by the official counters. This certificate is signed by C. N. Hoskins, S. W. Orcutt, F. W. Sallee, and D. Buckler, official counters, and was subscribed and sworn to before Edward Conklin, inspector of said precinct, on the 8th day of November, 1910. I believe and find from the evidence that said precinct certificate shows the exact number of votes received by Mr. Parker and Mr. Hausam, namely, for Mr. Parker 114, for Mr. Hausam 40, that were received by said parties for the office of county commissioner in precinct No. 3, and that the change in the count shown by a recount of the ballots in court is the result of the mutilation and forgery of said ballots, by reason of which the ballots are rejected by the court for the purpose of contradicting or impeaching the said certificate, and the certificate aforesaid is received and accepted by the court as the true and correct return and count of the votes received by plaintiff and defendant in precinct No. 3.

"I find from the evidence in this case that on the 8th day of November, 1910, in commissioner's district No. 1, of Wagoner county, Okla., Mr. Parker, the candidate upon the Republican ticket for said office, received 354 votes, and that Mr. Hausam, the candidate upon the Democratic ticket for said office, received 325 votes."

In *State ex rel. Montgomery v. State Election* et al., 29 Okla. 31, 116 Pac. 168, it is said:

"In order, then, that the result of an election may be with certainty preserved and made available, section 8 of article 2 [Laws 1907-07, c. 31], *supra*, was passed, which provides that on the completion of the count the tally sheets on which the tally is kept should be signed by all four counters; that a certificate permanently bound in the back of the book of ballots should be

filled out by the four counters; that the same should not be detached from the said book; and that the counters should also make out at least three duplicates of such certificate. Each of the four certificates thus provided for were to be prepared with pen and ink, and the result written not only in words, but also in figures, and each certificate when completed, it was required, should be signed and sworn to by all of the four counters. Then follows specific directions as to what should be done with each of these certificates. One of them was to be delivered to and kept by the chief election official of the precinct, the inspector, and the other two to accompany the stub book of ballots. There is much detail but not much law involved in a consideration of an action under these simple provisions. But there is a reason for each of the requirements contained in the statute. One of the duplicate certificates was left with the inspector to the end that the misfortune, catastrophe, or fraud which would destroy one might not destroy all and thereby leave a lack of evidence of the result of the election in that precinct. Likewise, as counsel suggest, it was doubtless also to make the result more certain and forgery or alteration more difficult." (Section 3136, Comp. Laws 1909 [section 8, art. 2, c. 31, Sess. Laws 1907-08]).

Obviously the trial court committed no error in permitting the certificate from precinct No. 4 which was retained by McCormick, the election inspector, to be introduced in evidence.

The question then remaining for determination is whether the finding of the court as to the question of fraud in precinct No. 3, or as to the admission of the ballots cast in said precinct to impeach the returns, is sustained by the evidence. The rule is well settled by this court that where a case is tried in a lower court without a jury, and special findings of fact are made, partly upon oral testimony, such findings are conclusive upon any disputed and doubtful question of fact. *Seward v. Casler et al.*, 24 Okla. 275, 103 Pac. 740.

Plaintiff in error insists that the trial judge was prejudiced against the defendant in the trial of said cause. No application as provided by statute was filed, setting forth the grounds of fact upon which it was claimed that said judge was disqualified (section 5, art. 1, c. 14, p. 169, Sess. Laws 1909), nor was such request presented to said judge for him to certify to such disqualification. No showing is made in the record as to why such appli-

cation or request prior to the trial was not made for such disqualification. In the absence of such showing so as to negative laches, at all events a party will not be permitted to set up in this court for the first time after the trial that the trial judge was prejudiced, and for that reason made a finding against him which would not have been made had he not been so prejudiced.

There being some substantial evidence to support the finding of the lower court, it would clearly be a usurpation in the exercise of appellate authority for the court to set aside the special findings of said court.

It follows that the judgment of the lower court must be affirmed.

All the Justices concur.